[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
On December 9, 1991, an arbitrator appointed by the American Arbitration Association filed a written decision (Ex. C) finding that Philip and Helen Kampner, the defendants herein, had breached a contract with Dennis White, the plaintiff herein, and awarding White a substantial sum of money. White and the Kampners have now filed in this court opposing motions to confirm and vacate the award. The court heard both motions in a consolidated evidentiary hearing on three days in January and March 1992. For the reasons set forth below, the award is vacated.
The question before the court is one of arbitrability. On August 27, 1990, White, the Kampners, and one Jeffrey Larson signed two separate contracts: a management contract (Ex. A) and a purchase contract (Ex. B). These contracts set forth conditions under which White and Larson were to manage and have an option to purchase State Paint, Inc., a business owned by the Kampners. Each contract contains two provisions of importance to this case, involving, respectively, mandatory negotiation and arbitration. The management contract provides as follows:
MANDATORY NEGOTIATION
 25. KAMPNER and MANAGERS [White and Larson] agree that they will attempt CT Page 3005 to negotiate in good faith any dispute of any nature arising under this Lease. The parties shall negotiate in good faith at not less than two negotiation sessions prior to seeking any resolution of any dispute under the provisions of Paragraph 26 of this Lease. Each party shall have the right to legal representation at any such negotiation session.
ARBITRATION
 26. Any dispute or question arising under the provisions of this Management Contract which has not been resolved under Paragraph 25 of this Management Contract shall be determined by arbitration before one (1) arbitrator appointed by the American Arbitration Association. Arbitration proceedings shall occur at a neutral location in Waterbury, Connecticut, and shall be conducted in accordance with the rules then applicable of the American Arbitration Association. The decision of the arbitrator shall be final and may be entered in any court having jurisdiction thereof. Each party shall pay one-half of all costs and expenses of such arbitration.
Paragraphs 5.0 and 6.0 of the purchase contract contain provisions that are identical (except for the section numbers) to the provisions of the management contract just quoted.
In December 1990, the Kampners dismissed White from his management position, alleging that he had stolen money from the cash register. The arbitrator found that the Kampners breached the management contract, but the accuracy of this finding is not before the court. What is before the court is the question of whether the matter could legally proceed to arbitration in the first place. This question arises from the fact that, while the contract calls for two negotiation sessions as a precondition to any request for arbitration, not even one negotiation session has ever occurred in this case.
The reasons for the failure to negotiate are contested by the parties, but the threshold question for the court is whether the question of arbitrability has itself been waived. The court CT Page 3006 concludes that it has not.
The proceedings before the arbitrator were unrecorded, and the witnesses in this court differed on whether the question of arbitrability had been submitted to the arbitrator. The court finds that it was. Edward G. Fitzpatrick (White's arbitration attorney) credibly testified that he and Richard Joseph (the Kampners' arbitration attorney) agreed at the conclusion of the arbitration hearing to submit their correspondence to the arbitrator so that the arbitrator could decide the issue of arbitrability. Attorney Fitzpatrick also testified, however, that this was done in the context of an objection to the entire proceeding by Attorney Joseph before the arbitration evidence began. Attorney Joseph's objection was based on the specific ground that no negotiation sessions had occurred. The court finds that this objection was seasonably made to the arbitrator and that no waiver occurred.
There are "two ways in which . . . a party may question the arbitrability of a particular issue. First, he may refuse to submit to arbitration and instead compel a judicial determination of the issue of arbitrability. His other alternative is to submit the issue in conjunction with the merits of the dispute to the arbitrators themselves." Schwarzschild v. Martin, 191 Conn. 316,323, 464 A.2d 774 (1982). "In such cases a court on a motion to vacate, may properly entertain a challenge to an award alleging disregard of the limits in the parties' agreement with respect to abritration." City of New Britain v. Connecticut State Board of Mediation and Arbitration, 178 Conn. 557, 560, 424 A.2d 263
(1979). Accord City of Bridgeport v. Bridgeport Police Local 1159, 183 Conn. 102, 105, 438 A.2d 1171 (1981).
On the underlying question of arbitrability, the court has received into evidence copies of the correspondence between Attorneys Fitzpatrick and Joseph submitted to the arbitrator. An additional letter (Ex. 7), which had been submitted to the arbitrator in redacted form because it contained a specific monetary demand, was submitted in full to the court. Both parties agreed that, thus augmented, the complete correspondence involving this issue was before the court. In addition, the court heard the testimony of White, Mr. Kampner, and Attorneys Fitzpatrick and Joseph on the issue of why the mandatory negotiation sessions did not occur. Based on this evidence, the court finds the following facts.
The Kampners dismissed White in December 1990. At the very beginning, both parties wanted to negotiate, as did their attorneys. On January 7, 1991, the Kampners' attorney wrote to White's attorney requesting a negotiation session (Ex. 3), and on January 14 and January 22 White's attorney responded that he, too, CT Page 3007 wished such a meeting (Ex. 4 5). (All dates hereafter are 1991 dates.) But "[b]etween the idea and the reality," as T.S. Eliot wrote, "falls the Shadow." T.S. Eliot, The Hollow Men (1925). No negotiation session would ever occur.
Each side has done its best to point an accusatory finger at the other to account for the failure to negotiate, and, upon inspection, neither finger is attached to an entirely spotless hand. The first difficulty arose because the Kampners were wintering in Florida. On January 23, Attorney Joseph (the Kampners' attorney) wrote to Attorney Fitzpatrick (White's attorney) saying, "Mr. Kampner is presently out of state and I will be in contact with you as soon as he returns, which I am told will be in early February." (Ex. 6.) At some point within the next two weeks, Joseph and Fitzpatrick had an oral conversation not memorialized in any letter or file memorandum. Joseph testified that he told Fitzpatrick he wanted negotiations and asked Fitzpatrick to get back to him. Fitzpatrick testified that he (Fitzpatrick) asked for a meeting and that Joseph asked him for a demand. Joseph, according to Fitzpatrick, said that White might get back the money he had invested (a sum of $50,000) but nothing else. Fitzpatrick testified that Joseph was "fairly firm" but that he (Fitzpatrick) "sensed some room to negotiate." Thus, whatever the details of the conversation, it is clear from the testimony of both attorneys that, as of the date of this conversation, negotiation was considered both possible and desirable.
In this context, the next letter came as something of a thunderbolt. On February 7, Fitzpatrick wrote a letter to Joseph (Ex. 7) which must be quoted in full:
 Pursuant to our recent discussion with regard to the above, please be advised that reconciliation of this matter, that is, a reunification of the parties appears unlikely. Accordingly, in an effort to resolve the matter short of arbitration, my client is willing to accept a sum of thirty-five thousand and 00/100 ($35,000.00) dollars to compensate him for his efforts in building up the business and in return for the release of his option to purchase as stated in the agreement between the parties.
 In addition, of course, his deposit in the amount of fifty thousand and 00/100 ($50,000.00) dollars must also be CT Page 3008 returned.
 Kindly contact me after you have had an opportunity to review this matter with your client.
At some point after this letter (the date is unclear) the lawyers spoke again. This conversation like the earlier one was not memorialized in any way, and the testimony of the lawyers was not identical. According to Joseph, Fitzpatrick told him, "Your clients don't want to negotiate — what's to talk about other than money?" Joseph, according to his testimony, replied that he wanted negotiations to limit the issues if nothing else. According to Fitzpatrick, Joseph said that his client (Mr. Kampner) was in Florida and would not be back until May. Fitzpatrick testified that he told Joseph that he would meet at any time. Both Joseph and Fitzpatrick were credible witnesses, and their accounts, while not identical, are not irreconcilable. The court finds that Joseph wanted negotiations and informed Fitzpatrick of that fact. Fitzpatrick may or may not have have wanted negotiations by this time (his letter of February 7 indicates that he did not), but he was not, in any event, willing to wait.
On April 2, 1991, Fitzpatrick filed a written Demand for Arbitration. (Ex. D.) On April 4, the American Arbitration Association wrote a letter to both attorneys acknowledging "receipt on April 4, 1991 from Edward G. Fitzpatrick of a Demand for Arbitration." (Ex. 9.).
On May 16, Joseph wrote to Fitzpatrick saying that his client would be back about Memorial Day and that the "mandatory negotiations sessions are well advised and . . . your demand for arbitration at this point of time is premature." (Ex. 10.) On May 20, Fitzpatrick responded with a letter accusing Mr. Kampner of "dragg[ing] his feet" and stating his intention "to proceed with arbitration." (Ex. 11.) On May 21, Joseph replied that his client intended "to comply with the language of the contract" in "comply[ing] with the mandatory negotiation sessions" and asking Fitzpatrick to give him "a call regarding scheduling." (Ex. 12.)
No "call regarding scheduling" was ever made. Fitzpatrick proceeded to arbitration with Joseph protesting all the way. Joseph wrote letters to the American Arbitration Association on September 17 (Ex. 13) and September 24 (Ex. 15) expressly stating that the arbitration should not proceed because no negotiation sessions had been held. As noted above, Joseph also registered an oral objection to the arbitrator before the commencement of the evidentiary hearing on October 30. CT Page 3009
Under these circumstances the court concludes as a matter of law that the contractual requirement of two negotiation sessions was never waived by the Kampners. It is very clear from the contracts that the occurrence of two negotiation sessions was a condition precedent to arbitration. It is well settled that,
 Where a contract contains a stipulation that the decision of arbitrators on certain questions shall be a condition precedent to the right of action on the contract itself, such a stipulation will be enforced, and, until arbitration has been pursued, or some sufficient reason is given for not pursuing it, no action can be brought on the contract.
Kantrowitz v. Perlman, 156 Conn. 224, 227, 240 A.2d 891 (1968). Logic and the law of contracts dictate that where a contract contains a stipulation that two negotiation sessions shall be a condition precedent to the right of arbitration, such a stipulation must also be enforced and, until negotiation has been pursued, or some sufficient reason is given for not pursuing it, no arbitration can occur.
This is not to say that the requirement of negotiation cannot be waived by a refusal to negotiate. "The duty of the parties is to act in good faith and make a fair effort to carry out the provisions and accomplish their object." Bernhard v. Rochester German Insurance Co., 79 Conn. 388, 395, 65 A. 134
(1906). Here, while the Kampner's efforts to negotiate could have been more energetic the evidence makes it clear that they were willing to negotiate from their attorney's initial letter of January 7 (Ex. 3) right up to the arbitration hearing itself on October 30. The only initial problem from the Kampners' point of view was that they were wintering in Florida. This unavailability makes the case somewhat problematic, but the fact is that White's position had hardened to an apparently inflexible demand by February 7 (Ex. 7), while the Kampner's, according to the testimony of White's attorney, were indicating "some room to negotiate." Moreover, the record is clear that the entire period between Memorial Day and October 30 went by with the Kampners in Connecticut and White not visibly lifting a finger to negotiate.
Negotiations are a part of everyday life in the modern commercial, judicial and political world. Even when the parties are the proverbial mile apart, success, while not invariable, can often occur, as every businessman, attorney, and diplomat knows. If negotiations had been held in this case, they may or may not have born fruit. That, of course, is unknowable. But the CT Page 3010 parties had committed themselves to the negotiation process by contract, and negotiation was an express precondition to arbitration. This provision was not waived by the Kampners. Under these circumstances, the award was in violation of the parties' agreement. See Schwarzschild v. Marin, supra,191 Conn. at 323.
For the foregoing reasons, the following orders shall enter:
The Application To Confirm Arbitration Award is denied.
The Application To Vacate And/Or Correct Arbitration Award And For Attorney's Fees is granted to the extent that the arbitration award is vacated. As agreed at the hearing, if the Kampners seek attorneys fees, they must now make a separate application seeking such fees. The court, by this decision, makes no finding as to whether any fees or costs are awardable.
Dated at Waterbury this 2nd day of April, 1992.
JON C. BLUE, J. JUDGE OF THE SUPERIOR COURT